WASHINGTON IRR. CO. v. KRUTZ et ux.

(Circuit Court of Appeals, Ninth Circuit. October 6, 1902.)

No. 786.

1. CONTRACTS—ILLEGALITY OF CONSIDERATION—SERVICES RENDERED BY PUBLIC OFFICER.

The officers of an irrigation company offered to convey 160 acres of land to the register of a land office in consideration of services rendered by him in the company's behalf with respect to certain lands in dispute before the department. He declined the offer, stating that he could not accept it while an officer, but would do so after his term expired, provided the company would give him some work to do in payment. After the expiration of his term, he rendered nominal services to the company, upon which the offer was renewed and accepted. *Held*, that the latter transaction was so blended with the former and the conditional acceptance of the first offer as to constitute a single transaction, and to render the agreement void and unenforceable in the courts, as against public policy.

2. SAME—NEW CONSIDERATION.

Complainant contracted with the officers of an irrigation company for water rights for a half section of land, in payment for which he was to convey a half section to the company; being credited thereon, however, with a quarter section which such officers had previously agreed to convey to him for an illegal consideration. He purchased the remaining quarter section, and caused the same to be conveyed to the company,

by which it was accepted and retained. *Held*, that such conveyance and acceptance constituted a new and sufficient consideration for the contract, which rendered it valid and enforceable, notwithstanding the illegality of the prior agreement.

**8.** CORPORATIONS—RATIFICATION OF UNAUTHORIZED CONTRACT.

The acceptance and retention by the irrigation company of the land conveyed to it by complainant, with knowledge of the contract under which the conveyance was made, was a ratification of such contract, even if it was originally made by its officers without authority.

**4.** SPECIFIC PERFORMANCE—DISCRETION OF COURT.

Specific performance is not a matter of absolute right, but rests entirely within judicial discretion, to be exercised according to settled principles of equity; and the relief will be granted when it is apparent from a view of all the circumstances of the particular case that it will subserve the ends of justice, and will be withheld when from a like view it appears that it will work hardship or injustice to either of the parties.

Appeal from the Circuit Court of the United States for the Southern Division of the District of Washington.

This is a petition praying for the specific performance of a contract for a water right for 320 acres of land. The main suit in which it was presented was entitled "California Safe Deposit & Trust Company v. Yakima Investment Company," for the foreclosure of a mortgage or trust deed securing the issue of about $700,000 in bonds. Receivers were appointed, decree and order of sale made, and the property mortgaged was sold to J. Dalzell Brown. The sale was confirmed, and Brown sold and transferred the property to the Washington Irrigation Company, appellant herein. The property involved in the foreclosure suit consisted of some 25,000 acres of arid land, and an irrigation canal and laterals covering a large scope of country. When the decree for the foreclosure and sale was entered, the court directed that the sale should be made as a whole of the lands and water system, and of all "contracts, options, and privileges of said Yakima Investment Company and its predecessors in interest, and of the receivers * * * in this suit, to acquire and purchase and to receive conveyances of lands and other property," and including all contracts by the investment company and its predecessors and receivers for the sale of water to other parties. The decree further provided that the purchaser and his successor should take said property subject to all valid existing contracts for the sale of any of the mortgaged lands and for the sale of water from said irrigating canals made by the defendant or the receivers, and jurisdiction of the case was expressly retained by the court for the purpose of enforcing these provisions of the decree. Before the confirmation of the sale the claim of the appellees herein was brought up, and it was stipulated and agreed in open court by the purchaser that their claim should not in any manner be prejudiced by the confirmation, and that, if the claim could not be amicably adjusted, the court expressly retain jurisdiction to hear and determine it.

It appears from the record herein that in 1890 congress passed an act forfeiting to the government every alternate odd section of the granted land held by the Northern Pacific Railroad Company. This act provided that, where the railroad company had previously sold or contracted to sell any of the lands falling within the limits mentioned, it had the privilege of protecting its vendees by surrendering other lands in lieu thereof; and it was required to file proper lists with the land department, showing the facts. About this time the original Sunnyside Canal Company was organized, and the railroad company had contracted to sell it a large acreage lying within the "overlap" of the branch and main lines. At this time Mr. Schulze was the general Western agent of the railroad company, and also president of the canal company. The petitioner Krutz was register of the local land office at North Yakima. In February, 1891, the commissioner of the general land office notified the local land office of the passage of the act of congress here-

¶ 3. See Corporations, vol. 12, Cent. Dig. § 1714.

inbefore referred to, and inclosed it a list of the lands which the railroad company had elected to take, and instructed the local office as to its course in regard to different matters arising out of the situation. Mr. Krutz knew that the railroad company had contracted to sell lands which were not included in its list, and he notified both the commissioner of the general land office and Mr. Schulze of the information he had, and called attention to the apparent oversight. The result of his action in this regard was the filing of an amended list by the railroad company. In the meantime the register of the local land office had published notice of the status of the land, as directed by the commissioner, and a number of citizens had expressed their purpose to file on the lands on the day that they were to be opened for settlement.

Mr. Krutz, in his own behalf, testified as follows: "About this time it was rumored that the N. P., Yakima & Kittitas Irrigation Company was to construct a large canal covering these lands. The result was that people in great numbers examined the land preparatory to offering to file for it. The railroad company had arranged about this time with the canal company to sell all its odd sections under the canal, including the forfeited sections. It appeared that the land department of the railroad company had been called upon by the commissioner to submit a list of the lands it had sold, embraced in the sections it had elected not to take. Through the carelessness of the railroad company, or Mr. Schulze, its Western land agent, this was not done. Knowing that the railroad company had sold or contracted to sell these lands to the canal company, I wrote a letter on February 18, 1891, to the commissioner of the land office, calling attention to this state of facts. * * * On the same day I wrote a letter to Mr. Schulze, at Tacoma, calling his attention to the same matter. Mr. Schulze was Western land agent of the railroad company, and also president of the canal company. * * * A short time thereafter I received a letter from the department, dated March 5, 1891, instructing me to publish notice of the amendment. * * * Several days before the date fixed for receiving applications to file for the land, Mr. Schulze came over to North Yakima to learn the true status of the lands, as disclosed by our records, and informed me of the dilemma the company was in. He asked me what I thought was the best course to pursue to extricate themselves. * * * I suggested to Mr. Schulze that he prepare and file a list of the lands he had sold to the canal company, and accompanying it with a protest against the acceptance and allowance of filings. I advised him to send these papers by mail to the land office, so that they would be received at the office before 9 o'clock a. m. on the date the land was to be subject to entry, so that they would take precedence over applications presented at the opening of the office. This was done. In the afternoon, before the date fixed for receiving filings, about fifty persons got in line, and remained all night at the land office to secure preference rights to file. At 11 o'clock that night the settlers sent for me to come to the land office to confer with them regarding their applications to file. They had heard the railway company was intending to file a protest against the acceptance of their filings. I explained to them that, if they insisted making their entries, I would issue certificates, and have the receiver give them receipts, or I would simply note the records of the time of their presentation, and if the protest should be filed I would forward the applications with the protest to the department, and recommend that a hearing be had to determine the rights of the respective parties. * * * They were pleased with these suggestions, and the matter was determined that way, and the records were forwarded to the department. * * * In the fall of 1891, and after the various applications and protests had been filed and were pending before the department in Washington, Mr. Schulze and Mr. Granger expressed themselves as being pleased at the turn the matter had taken, and offered to give me 160 acres of land under the canal. I rejected the offer, as I was register and could not accept it; but I told Mr. Schulze, if he could give me any work for the company after my term of office expired, so that I could feel that I had earned the land, I would then accept it. * * * I was out of office when the hearing was had, and the record forwarded to the department. It was found that the showing made

by the company was not sufficient to bear out the company's contention that the land was really sold before the forfeiture act was passed. Mr. Schulze sent for me to come to Tacoma. I went, and, after listening to his statement of the status of the case before the department, I suggested that the general manager of the Northern Pacific Coal Company be sent to Washington City to look after the cases. I advised Mr. Schulze to get relinquishments from the settlers who had made improvements on the lands. Only two of the fifty settlers (George W. Rodman and his son) had built houses on the land. I advised Mr. Schulze to get relinquishments from these parties, and this was done. * * * Mr. Schulze now claimed that I had rendered the services which entitled me to 160 acres of land. I had filed on a desert land claim covering the S. ½ of sec. 10, twp. 10 N., R. 21 E., and arranged with Mr. Schulze for water for the land by giving the company 320 acres, but I was to have credit for the 160 acres I was to receive for my services. In 1892 I conveyed to the company the N. ½ of the N. ¼ of sec. 12, twp. 10 N., R. 21 E., for which I paid $1,000 cash. In 1898 I completed the purchase of the W. ½ of the S. E. ¼ of sec. 18, twp. 10, range 21 east, from Eugene G. Kreider and wife, which cost me about $500. In order to save the trouble of making two deeds, I had Kreider and wife convey this land direct to the canal company. After the lands were sold at foreclosure sale and purchased by the Washington Irrigation Company, that company wanted to get a conveyance direct to it from Kreider; and I had Kreider and wife execute a new deed to that company. Mr. Granger, the manager of the Washington Irrigation Company, had written to Mr. Kreider, asking an explanation of Kreider's original deed to the old canal company, which, it seems, had never been recorded; and, when Kreider sent that letter to me, I wrote to Mr. Granger, explaining that this conveyance was procured by me in completion of the agreement for my water right, and then Mr. Granger requested me to get a new deed from Kreider direct to the Washington Irrigation Company, which I did. * * * These two tracts of land were conveyed by me and by Kreider and wife at my instance, in performance of my agreement to convey to the company 160 acres of land in payment for a water right for my 320 acres of land. No other consideration was paid by the canal company for that 160 acres, either to me or to Kreider. The canal company took possession of the first 80 acres conveyed by me in 1892, and kept possession until it or the receivers sold the land. The company or receivers took possession of the Kreider 80 acres in 1898, after Kreider's first conveyance, and kept possession until the spring of 1901, when the present company sold a part of it. It still has possession of the unsold portion of the land. I informed the receivers, J. S. Allen and George Donald, of the agreement for my water right, and they promised to give me a deed, but they never delivered it. * * * When the canal company went into the hands of the receivers, Mr. Schulze advised me to wait until the company got control of the property, and then we could adjust the matter, but Mr. Schulze killed himself. Mr. Schulze never recorded the deed which I gave the company in 1892, and at the suggestion of the receivers I made another deed of this land to the receivers in May, 1896, which they received, and the greater portion of it was sold by them."

On his cross-examination the following questions and answers were given: "Q. Mr. Krutz, was the contract which you state exists between you and Mr. Schulze oral or in writing? A. It was in writing. He sent a letter. Q. What did you do with that letter? A. I filed the letter with the receivers of the Yakima Investment Company. Q. What search have you made to find that letter? A. I searched among the papers in the office of the receivers, and was unable to find it, and I inquired of the receivers for it, but have been unable to find it."

Walter N. Granger testified on behalf of the Washington Irrigation Company that he was the general superintendent of the Washington Irrigation Company; that he had been connected with the Sunnyside Irrigation Canal from its inception; that "Mr. Schulze was the president of this company, and it had a board of trustees, and I was its vice president and general manager. * * * I am acquainted with the claim for a water right of Ira M. Krutz and wife. Both Mr. Krutz and Mr. Schulze informed me that

Mr. Schulze had promised Mr. Krutz a piece of land near Zillah, consisting of 160 acres, for services which Mr. Krutz had rendered, while register of the land office, for the Northern Pacific Railroad Company, in straightening out the applications of the railroad company as to the forfeited lands. I was not present at any time when Mr. Schulze made any promises to Mr. Krutz to give him land. But at North Yakima Mr. Schulze informed me that he had promised Mr. Krutz a piece of land, and I afterwards had a talk with Mr. Krutz, when he stated to me that Mr. Schulze had promised to give him 160 acres of land near Zillah. * * * I do not think that Mr. Krutz, after he ceased to be register of the land office, performed any services whatever for the irrigation company. * * * As to a water right to Mr. Krutz for 320 acres of land, this was an after consideration, as the first promise to Mr. Krutz was for 160 acres of land near Zillah, without a water right. * * * I never heard anything about a water right for 320 acres until he had filed upon his desert land claim. * * * I got that information from Mr. Krutz. I understood from Mr. Krutz during that time that there was such an understanding with Mr. Schulze, and, when the 80 acres was conveyed to the old canal company by Mr. Krutz, I understood that it was in performance of such an agreement; but I got that understanding from Mr. Krutz, and I never heard Schulze say anything about it."

E. F. Blaine, for appellant.

W. H. Bogle, for appellees.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge, after making the foregoing statement of facts, delivered the opinion of the court.

There are 12 errors assigned on this appeal, which embody, in various forms, the following propositions, viz.: That the services performed by Krutz for Schulze, for which he was to receive 160 acres of land, were rendered to the Northern Pacific Railroad Company, and not to the Yakima & Kittitas Irrigation Company, or its successor in interest; that Paul Schulze had no power to bind the irrigation company to convey to Krutz and wife, petitioners herein, a water right for 320 acres of land; that the receivers of the property of the Yakima Investment Company were without power to adopt or ratify the agreement upon which petitioners rely; that petitioners are in a court of equity with unclean hands, praying specific performance where there is a partial failure of consideration; that the petitioners can be fully compensated in damages; that the evidence failed to show the terms and conditions of the agreement entered into by Paul Schulze for the irrigation company and the petitioner Ira M. Krutz.

The third assignment reads as follows:

"Because the evidence showed that the services rendered by the petitioner Ira M. Krutz, for which he claims 160 acres of land and a water right for 160 acres of land, were services rendered by him while register of the United States land office at North Yakima, Washington, and that said services were a part of his official duties, and that the promise made to compensate him therefor was contrary to public policy and void, and the alleged agreement for a conveyance of a water right for 320 acres of land grew immediately out of said illegal claim, and is contrary to law and invalid."

Appellees herein allege in their petition that they were the owners of the S. ½ of section 10, township 10 N., range 21 E., containing 320 acres, and then allege the facts of the Yakima Improvement

Company's contract with the railroad company for large quantities of land, and aver—

"That doubts having arisen as to the title of said railroad company to said lands under said grant, and the steps that had been taken in pursuance thereto, this petitioner, Ira M. Krutz, at various times assisted in clearing up these clouds upon such titles and in preventing contests, and his assistance in that respect was of great benefit to said irrigation company, and enabled them to obtain a clear title to said lands; that thereafter said Yakima Improvement Company entered into an agreement with these petitioners whereby it contracted to convey to petitioners a good, sufficient, and perpetual water right from its irrigation canal, commonly known as the 'Sunnyside Canal,' for the lands of petitioners hereinabove described, if and whenever petitioners should convey or cause to be conveyed to said company a good title to one hundred and sixty acres of other lands lying under said canal or its laterals, which proposal was accepted by petitioners; that thereafter, said Yakima Improvement Company having become insolvent, under proceedings duly had in this honorable court in the above-entitled cause, J. S. Allen, Geo. Donald, and Paul Schulze were appointed receivers of the property and assets of said company, with authority to operate said property under the directions of this honorable court; that said receivers were fully advised of the terms of said agreement with petitioners, and approved and adopted the same; that afterward, on or about 12th day of May, 1896, these petitioners, in part performance of said contract and agreement, conveyed to said J. S. Allen and Geo. Donald, as such receivers, and for their said trust (the said Schulze having died prior thereto), the north half of the northwest quarter of section 12, township ten north, of range 21 east; that said conveyance was accepted by said receivers for their said trust; that thereupon said receivers prepared and signed a conveyance conveying to these petitioners a water right for their said lands, and filed said conveyance with the papers pertaining to said receivership, to be delivered to these petitioners upon the conveyance to said trust of the additional eighty acres specified in said agreement * * *; that they [petitioners] have fully complied with their said agreement; that said Washington Irrigation Company has received the full benefit thereof; and that petitioners are entitled to a specific performance upon the part of said company."

The answer of appellant denies the various allegations in the petition, and, among other things, avers as an affirmative defense that—

"Believing that the only services which the petitioner Ira M. Krutz had rendered the Yakima Investment Company or its predecessor were rendered by said Krutz while register of the local land office at North Yakima, Washington, and that his claim for compensation therefor was contrary to public policy and void, investigated his said claim, and reached the conclusion that all services performed by said Krutz, and being the services set forth in his said petition, were performed by him while register of said land office, and the same pertained to his duties as such register, and that said Krutz used his official position wrongfully and for private gain, and that the promise and agreement for a water right for 160 acres of land, if any, was founded upon, and immediately grew out of, his wrongful acts as register."

Upon these issues the cause was tried, and decree rendered in favor of petitioners. The record is presented without any bill of exceptions. There is no agreed statement of facts. There is what purports to be a statement of the testimony of witnesses, and of divers documents, exhibits, and letters. But it is not shown that any objections were made or exceptions taken to any part or portion thereof. There is not a single exception to any ruling of the court. Whatever was offered was taken down without any ruling of the court. Everything was admitted without objection. We cannot, therefore, be expected to discuss all the questions argued by counsel.

Were the transactions between the parties which led up to the contract herein sought to be enforced of such a character as to authorize this court to say, as a matter of law, that the contract is void as against public policy, or is the evidence sufficient to make it the duty of this court to declare that the contract, as proven, is valid? It is contended on behalf of appellees that, inasmuch as all the testimony was taken before the court, the decision of the lower court upon the facts is not subject to review. But in reply to this contention it is only necessary to say that the facts as to all of the transactions between the parties, upon the point mentioned, is undisputed. There is no conflict in the evidence upon any material point. The main question presented is a legal one, to be determined upon the undisputed facts.

It must be admitted that, if Krutz had accepted the offer of Schulze while he was in office, the bribery of the one and corruption of the other could not be questioned. Such a contract would be contra bonos mores, and could not be enforced in a court of justice. But Krutz did not accept the offer. He refused it, accompanying the refusal with the statement that he could not accept it while he was in office, but that his term of office would soon expire, and if the railroad company would then give him something to do, so that he could feel that he had earned the 160 acres of land, he would then accept the offer. The services rendered by petitioner to the railroad company at the request of Schulze after he went out of office were, in our opinion, purely nominal, and were so blended with the original offer made by Schulze, and conditional acceptance by Krutz, as to make it but one transaction; and if the case rested alone on such services, in connection with the manner of the original offer, it would unquestionably be the duty of a court of equity to put its seal of condemnation on the whole transaction, and dismiss a bill brought to enforce such a contract.

As register of the land office, Krutz was, as he states in his testimony, frequently called upon to give advice to people as to the manner of selecting and locating public lands, etc. It was his duty to inform such parties of the methods and procedure to be pursued in such matters, but he had no right to go outside of his legitimate duties in this respect, and become the partisan adviser of one applicant, and point out to him a course to be pursued whereby he could obtain a preference over others, to their prejudice and detriment. The action of a public officer should always be guided and controlled only by considerations of the public welfare, and a desire faithfully, honestly, and impartially to perform his official duties; and any action taken by him outside of his official duties, which tends to substitute for those considerations others, which are based upon illegal grounds, is clearly opposed to public policy and void. This principle is too well settled to require the citation of any authorities.

It is unnecessary to criticise the action of Mr. Krutz in regard to his conditional acceptance of the offer. He may have been actuated by good motives, without any intent to do wrong; and he may have thought that by the services he subsequently rendered he had justly earned the fee which entitled him to then accept a deed, as previously

offered by Schulze. But it is impossible to separate the services from the original offer, so as to make the last valid if the first was void. The services rendered by Krutz after he went out of office are so blended with the original promise and conditional acceptance as to make the whole a unit and indivisible. That which is bad destroys that which is good, and they perish together.

It is the duty of courts to carefully scrutinize contracts of this general character, and to condemn the very appearance of evil, as the tendency of such contracts is to lead to the encouragement of wrongdoing. Hence the relief asked for in such cases should not be granted. This result follows "without reference to the question whether improper means are contemplated or used in their execution. The law looks to the general tendency of such agreements, and it closes the door to temptation by refusing them recognition in any of the courts of the country." Tool Co. v. Norris, 2 Wall. 45, 56, 17 L. Ed. 868; Trist v. Child, 21 Wall. 441, 452, 22 L. Ed. 623; Meguire v. Corwine, 101 U. S. 108, 111, 25 L. Ed. 899; Oscanyan v. Arms Co., 103 U. S. 261, 275, 26 L. Ed. 539.

The argument of appellant's counsel is principally based upon the grounds we have discussed, and we have therefore deemed it proper to express our views in regard thereto. If the appellees were seeking any relief against the railroad company, based alone upon the promise of Schulze, as its agent, to convey 160 acres of land to Krutz in consideration of the services he had rendered to the railroad company, we would have no hesitation whatever in declaring that the contract between them could not be enforced in a court of equity. But the contract set forth in the petition was not made with the railroad company. It is not a party to these proceedings. The petitioners ask no relief against it. It is true that Paul Schulze advised, directed, and controlled the whole business. He was the guiding spirit in all of the transactions. But the contract herein sought to be enforced is a new contract, different in its nature, terms, and conditions from the contract which the railroad company made with Krutz, and it is based upon other considerations, and made long after Krutz went out of office. This contract calls for a water right for 320 acres of land, to secure which Krutz was required to convey to the water company 160 acres of land, which he did at the times and in the manner stated in the statement of facts. The record shows that the deeds to 160 acres of land were accepted by the water company, and that it sold a greater portion thereof, and appropriated the proceeds to its own use. For this reason it is not in a position to claim that Schulze, as president of the water company, or as receiver thereof, had no authority to make the contract. The corporation could not accept the conveyance for the land upon which the consideration of the contract was based, and then deny the authority of its president to enter into the contract. The record also shows that Mr. Granger, the general superintendent of appellant, knew that the lands conveyed by Krutz, as above stated, were in performance of his contract for a water right for his 320 acres of land. It also shows that Allen and Donald, the receivers, received the conveyance from Krutz of 80 acres of land with the knowledge that it was delivered in pursuance of the contract in question. It is

further shown that they prepared a deed conveying the water right for 320 acres to Krutz, but for some unexplained reason it was not delivered. Subsequently they notified Krutz that he would have to apply to the court for relief. Can it, in the light of these facts, be legally said that this new contract grew immediately out of the illegal contract made by Krutz with the railroad company? We think not. It is true that it was made with full knowledge of the prior agreement, and that it had a remote relation thereto, in this: that the occasion for making the new contract arose out of the existence of the prior illegal act. But this fact alone does not make it void. In Armstrong v. Toler, 11 Wheat. 258, 269, 6 L. Ed. 468, where the principles we have announced as to the invalidity of the prior agreement are clearly recognized, Marshall, C. J., speaking for the court, said, "A new contract, founded on a new consideration, although in relation to property respecting which there had been unlawful transactions between the parties, is not itself unlawful." He points out the various distinctions that should always be drawn with reference to the different kinds of contracts, and cites several authorities to show that on a new contract, by which money is advanced at the request of another, or there is an express promise to pay, an action may be sustained, although the money was advanced to satisfy an illegal claim. This distinction is founded on the ground that the money lent would constitute a new consideration, and be the foundation of a new contract, which could not be vitiated by a knowledge of the purpose for which the money was lent. We are of opinion that the principles announced in that case, and followed in many others of like import, are applicable to the facts in the present case. Moreover, whatever view might be taken of the relation which the illegal contract bears to the new contract, the appellant ought not to be permitted to refuse to perform this contract without first returning to Krutz the lands, or the full value thereof,—the fruits and advantages it had received. Its offer to pay him $400 for the 80 acres of land it had received from Kreider at Krutz's request is not such an offer as the law requires. It would be an act not only of hardship, but of apparent injustice, to deny specific performance herein, under all the circumstances, and compel Krutz to bring a suit against appellant for damages for its failure to return the property. Ordinarily the law leaves to parties the right to make such contracts as they please, demanding, however, that they shall not require either party to do an illegal thing, and that they shall not be against public policy or in restraint of trade. Manufacturing Co. v. Gormully, 144 U. S. 224, 233, 12 Sup. Ct. 632, 36 L. Ed. 414. But specific performance is not a matter of absolute right. It rests entirely within judicial discretion, to be exercised according to the settled principles of equity, so as to reach the ends of justice and of right. Snow v. Nelson (C. C.) 113 Fed. 353, 356; Newton v. Wooley (C. C.) 105 Fed. 541, 544; 20 Enc. Pl. & Prac. 392, and authorities there cited. No positive rule can be laid down by which the action of the court can be determined in all cases. In general it may be said, as was stated in Willard v. Tayloe, 8 Wall. 557, 567, 19 L. Ed. 501, "that the specific relief will be granted when it is apparent, from a view of all the circumstances of the particular case, that it will subserve the ends of jus-

tice, and that it will be withheld when, from a like view, it appears that it will produce hardship or injustice to either of the parties. It is not sufficient, as shown by the cases cited, to call forth the equitable interposition of the court, that the legal obligation under the contract to do the specific thing desired may be perfect. It must also appear that the specific enforcement will work no hardship or injustice." See, also, Nickerson v. Nickerson, 127 U. S. 668, 675, 8 Sup. Ct. 1355, 32 L. Ed. 314; Hennessy v. Woolworth, 128 U. S. 438, 442, 9 Sup. Ct. 109, 32 L. Ed. 500; Dent v. Ferguson, 132 U. S. 50, 67, 10 Sup. Ct. 13, 33 L. Ed. 242.

Without further discussion, our conclusion upon the whole case is that the new agreement made by Schulze, as president of the water company, with Krutz, for the conveyance of the water right for 320 acres of land, is, under all the facts considered herein, a valid one, and that the ends of justice would be subserved by its enforcement.

The decree of the circuit court is affirmed, with costs.